

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-21-00126-CV

———————————————————

SOUTHWIRE COMPANY, LLC, Appellant

V.

ANGIE SPARKS AND LARRY SPARKS, Appellees

On Appeal from the 236th District Court
Tarrant County, Texas
Trial Court No. 236-322296-20

Before Birdwell, Bassel, and Womack, JJ.
Memorandum Opinion by Justice Bassel

## MEMORANDUM OPINION

### I. Introduction

In this interlocutory appeal, Appellant Southwire Company, LLC raises one issue challenging the trial court's denial of its special appearance in which it claimed that a Texas court did not have personal jurisdiction to adjudicate the claims brought against it by Appellees Angie Sparks and Larry Sparks. We conclude that the trial court did not err by denying the special appearance. The record contains some evidence supporting the trial court's implied findings that are necessary to permit the exercise of specific jurisdiction over Southwire. Specifically, Southwire's contacts with Texas show that Southwire purposefully availed itself of the privilege of conducting business in Texas. Further, the Sparkses' claims relate to those contacts. Thus, we affirm the trial court's denial of Southwire's special appearance.

### II. Factual and procedural background

The Sparkses' petition claimed that they are "citizen[s] of Texas" and pleaded that they have an address in Granbury, Texas. The Sparkses pleaded that they had purchased a travel trailer, which they also describe as an RV, from a dealer located in Texas; the dealer is sued under the names United Recreation & Mobile Home Center, Inc.; United RV Center; and United RV Fort Worth (referred to collectively with Southwire as the defendants). According to the petition, the RV was equipped with a Surge Guard Surge Protector (model number 34750) that the Sparkses allege was manufactured by Southwire. The Sparkses claimed that they purchased the Surge

Guard at the same time that they purchased the RV and that Southwire "direct[ed] customers to purchase its products from defendant United RV Center in Texas, where the surge protector [that is the] subject of this action was purchased." The Sparkses claim that United RV represented to them "that if they did not purchase the [s]urge [p]rotector together with their purchase of the [RV], it would void the warranty on their new RV."

At some point after the purchase, the Sparkses attempted to use the RV's electric fireplace, which allegedly produced an electrical short that caused "a threat of fire and sparks shooting out of the circuit breaker box." Mrs. Sparks claimed that she ran from the RV in an attempt to unplug it from its electric connection, that she fell, and that she suffered a debilitating injury. In turn, Mr. Sparks claimed that he had "suffer[ed]" from the defendants' acts and had also experienced a loss of consortium and mental anguish as a result. The absence of a ground-fault circuit interrupter and an arc-fault circuit interrupter in the RV allegedly caused the sparking incident. The petition also alleged that the actions of United RV and Southwire (as the Surge Guard's manufacturer) were a producing cause of the Sparkses' injuries.

The Sparkses asserted causes of action for breach of warranty and violations of the Texas Deceptive Trade Practices Act. They asserted a breach of the warranty of merchantability against Southwire and alleged that "the surge protector was not merchantable nor fit for its intended purpose because it was not fit for ordinary purposes [as] it did not function as a surge protector and did not protect from a

power surge." The petition also included a claim against Southwire for breach of the implied warranty of fitness for a particular purpose. The breaches of warranty were also alleged to constitute a violation of the DTPA because Southwire allegedly engaged in an unconscionable action that took advantage of the Sparkses' lack of knowledge of the "non-working state of the surge protector to a grossly unfair degree."

In their original petition, the Sparkses stated the basis for jurisdiction against Southwire to be that it "had continuous and systematic contacts with the [S]tate of Texas sufficient to establish general jurisdiction over said Defendant. Additionally, as set forth above, this Defendant has a registered agent for service of process in Texas."

Southwire responded to the original petition by filing a special appearance that asserted that a Texas court does not have personal jurisdiction over it under a theory of general jurisdiction because it is "at home" in Georgia, not in Texas. The special appearance attached a sworn declaration from a Southwire engineering manager, who averred that Southwire was organized in Delaware and that its company-wide decisions are made in Georgia. The declaration continued, stating that Southwire's products are widely distributed and that the company operates in many locations throughout the United States.

> The declaration described Southwire's method of distributing its products:
>
> Generally, Southwire's Surge Guards are not sold to the public but are sold to unrelated distributors. Those unrelated distributors generally resell the products to dealers, who resell to the public. The dealers are

4

also unrelated to Southwire.  In other words, usually, Southwire is at least twice removed from a retail customer.  In some instances, Amazon sells Southwire products through internet sales.  However, those sales are through a re-seller, not directly from Southwire.

Further, the declaration stated that because the Sparkses had not provided "a serial number, lot number, or other information" for the Surge Guard, Southwire could not identify the "specific device."  But the declaration also noted that "Southwire [could not] locate any record of selling a Surge Guard with the model referenced in the [p]etition to an RV dealer in Texas.  Southwire's records reflect[ed] that it ha[d] not sold the Surge Guard with the model number referenced in the [p]etition since 2015."  The declaration acknowledged that Southwire "does business in Texas" and has a registered agent in the state.  It also noted that "Southwire has two manufacturing plants in Texas and a facility for distribution, but it does not maintain a permanent general business office through which it solicits business in Texas."

With respect to the incident at issue, the declaration stated a conclusion that the Sparkses' "alleged claims do not arise from, and are not related to, any activity conducted by Southwire in Texas."  Specifically, no employee of Southwire was present when the Surge Guard was sold to the Sparkses, and Southwire did not authorize a person in Texas to make any representation about the Surge Guard in Texas.

5

After a continuance of an initial setting, the trial court heard Southwire's special appearance. The day of the hearing, the Sparkses filed an amended petition that appears to be identical to their original petition, except that it augmented the jurisdictional allegations against Southwire by pleading that

> Defendant Southwire Company, LLC had continuous and systematic contacts with [t]he State of Texas sufficient to establish general jurisdiction over said Defendant. Additionally, as set forth above, this Defendant has a registered agent for service of process in Texas; is qualified to do business in Texas; owns a related entity located in Texas; does business in Texas; has two manufacturing plants in Texas; has a facility for distribution in Texas; maintains a website soliciting business from customers in Texas for sales; provides a list of registered dealers in Texas on its websites; and directs customers to purchase its products from defendant United RV Center in Texas, where the surge protector [that is the] subject of this action was purchased, and provides their address.

At the time they filed their amended petition, the Sparkses also filed a response to Southwire's special appearance; the response contended that a Texas court held both general and specific jurisdiction over Southwire. Attached to the response was a declaration from the Sparkses' attorney that included a paragraph stating that "Ex. A is a true and accurate copy of the Defendant Southwire Company, LLC's website (*Internet*, http:[//]southwire.com, last visited March 26, 2021) where it actively directs Texas consumers to purchase its RV surge protectors from its registered dealer, the Defendant United RV in Ft. Worth, Texas." The referenced Exhibit A had the following screenshot from Southwire's website:

6



The declaration also noted that Southwire was authorized to do business in Texas.

At the hearing on the special appearance, no party adduced evidence. The trial court denied Southwire's special appearance, and Southwire filed an interlocutory appeal of that order. Southwire requested findings of fact and conclusions of law from the trial court but did not file a notice of past-due findings. *See* Tex. R. Civ. P. 297.

## III. The legal principles that apply to our jurisdictional analysis

### A. Standard of review

The Texas Supreme Court recently described (1) why jurisdiction is required to bind a party to a judgment, (2) the standard of review that we follow in reviewing a

trial court's decision regarding whether or not to exercise personal jurisdiction, and

(3) the findings that we imply when the trial court has not filed findings:

> A court must have both subject[-]matter jurisdiction over a case and personal jurisdiction over the parties to issue a binding judgment. Personal jurisdiction involves a court's ability to bind a particular party to that judgment. Whether a court may exercise power over a party is a question of law, which we review de novo. Resolving this question of law, though, may require a court to decide questions of fact. When, as here, the trial court does not issue findings of fact and conclusions of law with its judgment, we presume all factual disputes were resolved in favor of the trial court's decision unless they are challenged on appeal.

*Luciano v. SprayFoamPolymers.com, LLC*, 625 S.W.3d 1, 7–8 (Tex. 2021) (citations omitted).

In the absence of findings, we "must affirm if the judgment can be upheld on any legal theory supported by the evidence." *Michelin N. Am., Inc. v. De Santiago*, 584 S.W.3d 114, 122 (Tex. App.—El Paso 2018, pet. dism'd) (op. on reh'g). "When the appellate record includes the reporter's and clerk's records, these implied findings are not conclusive and may be challenged for legal and factual sufficiency in the appropriate appellate court." *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002).

B. **The shifting burdens that apply to the analysis of a challenge to personal jurisdiction**

A party may challenge a Texas court's exercise of personal jurisdiction over it by filing a special appearance under Texas Rule of Civil Procedure 120a. *See* Tex. R. Civ. P. 120a. The process of resolving a special appearance sets in motion a

complicated procedural sequence in which the intermeshing of the shifting burdens of proof on issues of personal jurisdiction may generate both legal and factual questions. The burdens flow as follows:

- "[T]he plaintiff bears the initial burden to plead sufficient allegations to bring the nonresident defendant within the reach of Texas's long-arm statute." *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 658 (Tex. 2010).

- "Once the plaintiff has pleaded sufficient jurisdictional allegations, the defendant filing a special appearance bears the burden to negate all bases of personal jurisdiction alleged by the plaintiff." *Id.* The defendant's burden is "tied to the allegations in the plaintiff's pleading." *Id.*

- "If the plaintiff fails to plead facts bringing the defendant within reach of the long-arm statute . . . , the defendant need only prove that it does not live in Texas to negate jurisdiction." *Id.* at 658–59. To correct the failure to allege jurisdictional facts, the plaintiff should amend to include "necessary factual allegations." *Id.* at 659.

- "The defendant can negate jurisdiction on either a factual or legal basis." *Id.*

o "Factually, the defendant can present evidence that it has no contacts with Texas, effectively disproving the plaintiff's allegations." *Id.*

o To negate jurisdiction on a legal basis,

> the defendant can show that even if the plaintiff's alleged facts are true, the evidence is legally insufficient to establish jurisdiction; the defendant's contacts with Texas fall short of purposeful availment; for specific jurisdiction, that the claims do not arise from the contacts; or that traditional notions of fair play and substantial justice are offended by the exercise of jurisdiction.

*Id.*

- Should the defendant make a factual challenge to the plaintiff's jurisdictional allegations, "[t]he plaintiff can then respond with its own evidence that affirms its allegations, and it risks dismissal of its lawsuit if it cannot present the trial court with evidence establishing personal jurisdiction." *Id.* (footnote omitted).

**C.    The basic questions that must be answered to decide whether a Texas court has personal jurisdiction over a defendant**

Two fundamental questions must be answered in deciding whether a Texas court may bind a foreign defendant to its judgment:  (1) does the Texas long-arm statute authorize the exercise of jurisdiction; and (2) does the exercise of jurisdiction comport with federal due-process guarantees. *Luciano*, 625 S.W.3d at 8.  These two questions meld into one because the long-arm statute requires a nonresident to be

"doing business" in Texas, and the supreme court has held that the "broad doing-business language allows the [long-arm] statute to 'reach as far as the federal constitutional requirements of due process will allow.'" *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 575 (Tex. 2007); *see also Spir Star AG v. Kimich*, 310 S.W.3d 868, 872 (Tex. 2010) ("Our long-arm statute reaches 'as far as the federal constitutional requirements for due process will allow.' Consequently, the statute's requirements are satisfied if exercising jurisdiction comports with federal due[-]process limitations." (citations omitted)).

Stated most broadly, the exercise of jurisdiction meets federal due-process standards "only if the defendant has established 'minimum contacts' with the forum state such that maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Luciano*, 625 S.W.3d at 8.

**D.    The distinction between the two types of personal jurisdiction that a Texas court may exercise**

Courts analyze whether the due-process standard is met from two perspectives: general jurisdiction and specific jurisdiction. *Id.* General jurisdiction deals with a defendant's overall presence in a state and may be exercised when the defendant's "affiliations with the [s]tate are so 'continuous and systematic' as to render [it] essentially at home in the forum [s]tate." *Id.* (quoting *TV Azteca v. Ruiz*, 490 S.W.3d 29, 37 (Tex. 2016)). "By contrast, specific jurisdiction 'covers defendants less intimately connected with a [s]tate[] but only as to a narrower class of claims.'" *Id.*

11

(quoting *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021). The narrower class of claims falling within specific jurisdiction requires a showing that "the defendant purposefully avails itself of the privilege of conducting activities in the forum state, *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 877, 131 S. Ct. 2780, [2785] (2011) (plurality opinion), and [that] the suit 'arise[s] out of or relate[s] to the defendant's contacts with the forum.'" *Luciano*, 625 S.W.3d at 8–9 (first quoting *Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, 137 S. Ct. 1773, 1780 (2017); and then quoting *Moki Mac*, 221 S.W.3d at 576).

### E. When a defendant purposefully avails itself of the privilege of conducting business in Texas for purposes of specific jurisdiction

When speaking of a defendant's purposeful availment, each word in the phrase carries significance. The acts creating the contact must be those of the defendant itself; the "unilateral activity" of a third party does not qualify. *Id.* at 9. What a defendant must avail itself of is "the privilege of conducting activities within the forum [s]tate, thus invoking the benefits and protections of its laws." *Id.* (quoting *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S. Ct. 1228, 1240 (1958)). And to meet the standard of purposefulness, the defendant must act deliberately, i.e., it has "'deliberately' engaged in significant activities within a state"; it "manifestly has availed [itself] of the privilege of conducting business there." *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475–76, 105 S. Ct. 2174, 2184 (1985)).

Contacts that are fortuitous and attenuated do not satisfy the purposeful-availment standard. *Id.* A defendant's act of purposeful availment must provide it with "clear notice that it is subject to suit" in the forum state. *Id.* (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S. Ct. 559, 567 (1980)). When a defendant has such clear notice, it "can act to alleviate the risk of burdensome litigation by procuring insurance[;] passing the expected costs on to customers[;] or, if the risks are too great, severing its connection with the [s]tate." *Id.* (citing *World-Wide Volkswagen*, 444 U.S. at 297, 100 S. Ct. at 567).

A long-debated issue in determining questions of specific personal jurisdiction is whether introducing a product into the stream of commerce constitutes purposeful availment. *See LG Elecs., Inc. v. Lovers Tradition II, LP*, No. 05-19-01304-CV, 2020 WL 4281965, at *10–11 (Tex. App.—Dallas July 27, 2020, pet. dism'd) (mem. op.). Simply because a product is swept into another state by the stream is not enough. *See Luciano*, 625 S.W.3d at 10. Adopting a plurality opinion from the United States Supreme Court, Texas permits the exercise of jurisdiction over the entity placing the product in the stream of commerce when that entity has engaged in "additional conduct" that evinces "'an intent or purpose to serve the market in the forum [s]tate,' whether directly or indirectly." *Id.* (first citing *TV Azteca*, 490 S.W.3d at 46; and then quoting *Asahi Metal Indus. Co. v. Superior Ct. of Cal.*, 480 U.S. 102, 112, 107 S. Ct. 1026, 1032 (1987) (plurality opinion)). This test is sometimes termed "stream of commerce plus." *LG Elecs.*, 2020 WL 4281965, at *10–11 (utilizing the term "stream of

13

commerce plus").[1]  "Evidence of such additional conduct [that meets the stream-of-commerce-plus test] may include advertising in the forum state[;] soliciting business through salespersons[;] or creating, controlling, or employing the distribution system that brought the product into the forum state."  *Luciano*, 625 S.W.3d at 10 (citations omitted).

The Texas Supreme Court has described the parameters of when a sales-and-distribution network constitutes sufficient additional conduct:  the "operation of a sales[-]and[-]distribution network" or "direct[ing] marketing efforts to [the forum state] in the hope of soliciting sales" may render a nonresident subject to the state's jurisdiction in disputes "arising from that business."  *Id.* at 11.  The rationale for this rule is that when a manufacturer seeks to serve a market indirectly through the use of affiliate or independent distributors, "it is not unreasonable to subject it to suit in one of those [s]tates if its allegedly defective merchandise has there been the source of injury to its owner or to others."  *Spir Star*, 310 S.W.3d at 871 (quoting *World-Wide Volkswagen*, 444 U.S. at 297, 100 S. Ct. at 567); *see also Luciano*, 625 S.W.3d at 10.

There are, however, limits to the extent that a defendant's sales-and-distribution efforts may be used to establish purposeful availment:

- The principle is applicable only to specific jurisdiction.  *Spir Star*, 310 S.W.3d at 874.

---

[1]Southwire repeatedly refers to a "targeting the market theory."  We interpret this term as Southwire's shorthand for the stream-of-commerce-plus theory that we discuss below.

14

- There must be a substantial connection between the contact and the operative facts of the litigation. *Id.* at 874–75 (stating that "when a nonresident's only contacts with Texas involve indirect sales through a distributor or subsidiary, specific jurisdiction is limited to claims arising out of those sales").

- There must be a substantial connection to the product sold. *Id.* at 875 (stating that the fact "[t]hat similar products were sold in Texas would not create a substantial connection as to products that were not").

- There may be reasons unrelated to serving the Texas market for having a Texas distributor. *Id.* (stating that "[a] Texas distributorship may increase the manufacturer's bottom line because it is more efficient or has greater access to economies of scale[] and not because it is intended to serve Texas consumers").

A few months ago, the Texas Supreme Court applied the outlined principles to hold that a manufacturer of spray-foam insulation, which was used by Texas residents to insulate their home, had purposefully availed itself of the Texas market for purposes of personal jurisdiction. *See Luciano*, 625 S.W.3d at 9–14. The supreme court focused on two facts to support its holding. First, the manufacturer had a Texas distribution facility, which handled logistics for its products. *Id.* at 10–11. Even though a third party actually shipped the products, a distribution facility from

15

which the company shipped its products at its own direction showed that the existence of that facility was neither "adventitious . . . nor thrust upon" the company; instead, the company's "use of a warehouse to maintain a stock of merchandise in Texas was deliberate." *Id.* at 11.

Further, the company had an independent contractor sales representative in Texas. *Id.* *Luciano* noted the supreme court's prior holding in *Spir Star* that emphasized that a defendant may be targeting the Texas market even if it is using an independent distributor to accomplish the sales:

> In *Spir Star*, we said that "[w]hen an out-of-state manufacturer . . . specifically targets Texas as a market for its products, that manufacturer is subject to a product[-]liability suit in Texas based on a product sold here, even if the sales are conducted through a Texas distributor or affiliate." 310 S.W.3d at 874. There, the manufacturer utilized an independent distributor who "agreed to serve as the sales agent" in Texas, thus satisfying *Asahi*'s "additional conduct" standard. *Id.* at 875 (citing *Asahi*, 480 U.S. at 112, 107 S. Ct. [at 1032]). While the manufacturer in *Spir Star* did not receive any of the intermediary's profits and relinquished title before the products reached Texas, the manufacturer "reap[ed] substantial economic gain through its sales." *Id.*

*Id.* at 11–12. *Luciano* focused on whether the manufacturer was using the agent to avail itself of the Texas market by making sales in that market through the agent and not on how the company structured its relationship with the agent. *Id.* at 12. The fact that the representative was an independent contractor did not, in the supreme court's view, impact the question that the company was using the representative to effect sales to Texas residents. *Id.* The relevant fact for the purposeful-availment analysis was that the representative functioned to find customers in Texas. *Id.*

16

The supreme court summarized its holding and reasoning on the purposeful-availment question as follows:

> Viewing [the insulation manufacturer's] purposeful conduct with respect to Texas in totality, we cannot say that [the manufacturer's] contacts with Texas resulted from the "mere fortuity" that the [homeowners] reside in Texas. Placing its product into the stream of commerce in conjunction with its "additional conduct" of soliciting business and distributing its product in Texas is sufficient to hold that [the manufacturer] purposefully availed itself of the Texas market.

*Id.* at 13–14 (citation omitted).

**F.  When a claim arises out of or relates to a defendant's Texas contacts for purposes of specific jurisdiction**

As noted, specific jurisdiction has two prongs. The second is "relatedness." *Id.* at 14 (citing *Bristol-Myers*, 137 S. Ct. at 1780). Specifically, "[d]espite a nonresident defendant's flood of purposeful contacts with the forum state, the exercise of specific jurisdiction is prohibited if 'the *suit*' does not 'aris[e] out of or relat[e] to the defendant's contacts with the *forum*.'" *Id.* "This so-called relatedness inquiry defines the appropriate 'nexus between the nonresident defendant, the litigation, and the forum.'" *Id.* (quoting *Moki Mac*, 221 S.W.3d at 579).

*Luciano* explained the changing face of the relatedness inquiry that resulted from the 2021 United States Supreme Court opinion in *Ford Motor Co. Id.* (citing *Ford Motor Co.*, 141 S. Ct. at 1022). In *Ford Motor Co.*, the United States Supreme Court answered the question of whether relatedness required a causal relationship between the contacts and the injury or whether the fact that the injury related to the contact

17

was sufficient. 141 S. Ct. at 1022. *Ford Motor Co.* held that a causal connection was not required. *Id.* A close relationship is sufficient. *Id.* *Luciano* gave a detailed discussion of *Ford Motor Co.*'s holding and how that holding impacted the plaintiffs' claims in the case before it. *Luciano*, 625 S.W.3d at 15–18.

*Ford Motor Co.* involved two plaintiffs who filed product-liability suits against the motor company to recover for injuries sustained while driving Ford automobiles in the forum states. 141 S. Ct. at 1022–23. Ford argued that the states where the injuries occurred did not have jurisdiction over the company because "a state court would have jurisdiction only if the company's conduct in the state '*gave rise to*' the plaintiff's claims, a causal link that exists only if the company designs, manufactures, or sells the particular vehicle involved in an accident in the forum state." *Luciano*, 625 S.W.3d at 15 (quoting *Ford Motor Co.*, 141 S. Ct. at 1023, 1026).

The United States Supreme Court rejected this argument for reasons that *Luciano* explained as follows:

> The Supreme Court [held] that "when a company like Ford serves a market for a product in a [s]tate and that product causes injury in the [s]tate to one of its residents, the [s]tate's courts may entertain the resulting suit." [*Ford Motor Co.*, 141 S. Ct. at 1022]. A "causation-only approach finds no support in [the] Court's requirement of a 'connection' between a plaintiff's suit and a defendant's activities." *Id.* at 1026 (citing *Bristol-Myers*, 137 S. Ct. at 1776). Instead, due process demands that a suit "arise out of or *relate to*" the defendant's contacts with the forum. *Id.* (quoting *Bristol-Myers*, 137 S. Ct. at 1780). The first half of that standard, the Court said, "asks about causation." *Id.* The latter half "contemplates that some relationships will support jurisdiction without a causal showing." *Id.* "That does not mean anything goes," the Court warned,

because "'relate to' incorporates real limits" to adequately protect nonresident defendants. *Id.*

> The Court equated *Ford Motor Co.* to *World-Wide Volkswagen*— what it described as the "paradigm case" for specific jurisdiction. *Id.* at 1027–28. In *World-Wide Volkswagen*, the *Ford* Court observed, both Audi—the manufacturer—and Volkswagen—the nationwide importer—were subject to specific jurisdiction in Oklahoma because their business "deliberately extended into [that state]." *Id.* at 1027. The forum state could thus hold the companies accountable for injuries "even though the vehicle had been designed and made overseas and sold in New York." *Id.*

*Id.*

*Luciano* described *Ford Motor Co.*'s basis for concluding that the relationship between the car company's contacts with the forum state and the plaintiffs' claims— even though not a causal one—were sufficiently related to permit the exercise of personal jurisdiction:

> Addressing how Ford's Montana- and Minnesota-based conduct "relates to" the respective claims, the Court first noted that the suits were brought by residents of the forum states. [*Ford Motor Co.*, 141 S. Ct. at 1028]. Each suit arose from an accident in the forum state. *Id.* Each suit alleged that a defective Ford vehicle caused the resultant harm. *Id.* And "Ford had advertised, sold, and serviced those two car models in both [s]tates for many years." *Id.* Put succinctly, "Ford had systematically served a market in Montana and Minnesota for the very vehicles that the plaintiffs allege malfunctioned and injured them in those [s]tates[, s]o there is a strong 'relationship among the defendant, the forum, and the litigation.'" *Id.* (quoting *Helicopteros Nacionales de Colom., S.A. v. Hall*, 466 U.S. 408, 414, 104 S. Ct. 1868, [1872] (1984)). While the plaintiffs did not establish, or even allege, that Ford's in-state activities resulted in their purchasing the cars, the Court said that jurisdiction should not "ride on the exact reasons for an individual plaintiff's purchase, or on his ability to present persuasive evidence about them" because the reach of Ford's Minnesota and Montana contacts underscored the aptness of finding jurisdiction. *Id.* at 1029.

19

> Allowing the forum states' courts to exercise jurisdiction in the two cases was neither undue nor unfair. *See id.* at 1029–30.

*Id.* at 16.

Applying the holding of *Ford Motor Co.*, *Luciano* concluded that the contacts of the insulation manufacturer that had challenged the jurisdiction of Texas courts were sufficiently related to the homeowners' claims to establish specific jurisdiction. *Id.* at 16–17. Three factors established the necessary relationship:

- The injury was sustained in the Texas residents' home. *Id.* at 16. The fact that the injury occurred in the forum state was not a prerequisite to jurisdiction but one that was relevant to the relatedness prong. *Id.* at 17.

- The homeowners alleged that the insulation manufacturer sold the insulation in Texas, and the manufacturer did not contend that the sale was an isolated occurrence. *Id.* The fact that the manufacturer served a market for the type of insulation at issue and that the insulation malfunctioned and injured the homeowners in Texas showed that "there is a strong 'relationship among the defendant, the forum, and the litigation'—the 'essential foundation' of specific jurisdiction." *Id.*

- *Luciano* also rejected the holding of the court of appeals that the homeowners could not establish the necessary relationship unless they proved that the insulation was shipped from the manufacturer's Texas distributor. *Id.* Such a strict causal connection is not required; "[i]t is

20

sufficient that [the manufacturer] intended to serve a Texas market for the insulation that the [homeowners] allege injured them in this lawsuit."

*Id.*

## IV. Analysis

**A.    Where our analysis falls in the shifting burdens of proof involved in a jurisdictional analysis and what information filed by the parties we will consider in our analysis**

First, we must locate ourselves in the shifting pleading-and-proof burdens that we have described above.  As noted, the Sparkses initially pleaded that a Texas court had general jurisdiction over Southwire, and Southwire's special appearance was directed to that allegation.  However, at the eleventh hour, the Sparkses amended their petition to expand their allegations of jurisdictional facts to include the following:

> Additionally, as set forth above, [Southwire] has a registered agent for service of process in Texas; is qualified to do business in Texas; owns a related entity located in Texas; does business in Texas; has two manufacturing plants in Texas; has a facility for distribution in Texas; maintains a website soliciting business from customers in Texas for sales; provides a list of registered dealers in Texas on its websites; and directs customers to purchase its products from defendant United RV Center in Texas, where the surge protector [that is the] subject of this action was purchased, and provides their address.

Also, though the Sparkses did not allege what state they were in when the incident that allegedly caused Mrs. Sparks's injury occurred, the amended petition alleged that Southwire manufactured the surge protector, identified it by model

21

number, and stated that it "was sold to the [Sparkses] through [Southwire's] dealer"—United RV.

The petition also stated that the Sparkses had purchased the surge protector when they had purchased the RV and that United RV had represented to them that the surge protector had to be purchased at the same time that they purchased the RV in order to have warranty coverage on the RV. The surge protector was allegedly installed in the RV and was allegedly used by them as an interface between the RV and the drop line of the RV park. The petition also alleged that the surge protector "was not merchantable nor fit for its intended purpose because it was not fit for ordinary purposes—it did not function as a surge protector and did not protect from a power surge." Based on the breach of the warranty of merchantability, the Sparkses alleged that Southwire had violated provisions of and committed an unconscionable act under the DTPA.

The pleading containing these allegations was filed the morning of the special-appearance hearing, but Southwire did not move for a continuance of the hearing, did not move to strike the amended petition, and does not claim on appeal that we cannot consider the allegations because of the petition's late filing. Instead, in its brief, Southwire challenges the adequacy of the allegations contained in the amended petition.

Southwire argues that the amended petition was so bereft of jurisdictional allegations that to negate jurisdiction, Southwire had to show only that it was not a

Texas corporate citizen because it is not "at home" in Texas. Specifically, Southwire argues that "[a]bsent adequate jurisdictional pleadings, [Southwire] negated jurisdiction by establishing [that] it was not organized in Texas and [that] its principal place of business is not in Texas. . . . [The Sparkses] were then required to present *evidence* of the jurisdictional facts supporting specific jurisdiction." Southwire makes this argument by relying on the step in the jurisdictional analysis that "[i]f the plaintiff fails to plead facts bringing the defendant within reach of the long-arm statute . . . , the defendant need only prove that it does not live in Texas to negate jurisdiction." *See Kelly*, 301 S.W.3d at 658–59.

The allegations in the Sparkses' amended petition are not so bereft of jurisdictional allegations as Southwire claims, and those allegations are adequate to allege specific jurisdiction. The amended petition's jurisdictional allegations substantially mimic the facts of *Luciano*: Southwire distributes its products in Texas and has a dealer in Texas, and the Sparkses—Texas residents—purchased the surge protector from that dealer.

The San Antonio Court of Appeals dealt with a petition that contained a similar presentation of the facts and concluded that it adequately alleged personal jurisdiction. *See Ji-Haw Indus. Co. v. Broquet*, No. 04-07-00622-CV, 2008 WL 441822, at *1–4 (Tex. App.—San Antonio Feb. 20, 2008, no pet.). *Ji-Haw*'s description of the allegations and its holding are as follows:

23

In her First Amended Petition, Broquet specifically named each defendant and stated that all defendants would be referred to collectively as "Defendants." She alleged that a fire [had] started in her home as a result of a defect in an XBOX game system ("the game console itself and/or the power line cord, and/or these components in combination") that was "designed, manufactured and marketed by Defendants." In a separate section of the petition entitled "Defendants Ji-Haw," Broquet alleged [that] Ji-Haw was "legally responsible for the incident made the basis of this suit." She asserted [that] Ji-Haw was guilty of negligence and [that] its negligence was a proximate cause of the incident underlying the suit. Broquet further alleged [that] Ji-Haw was strictly liable and that its conduct was a producing cause of the fire and injuries. In asserting strict liability, she referenced the theories set forth against other defendants earlier in the petition. Finally, she alleged that "[a]ll or a substantial part of the events or omissions giving rise to this claim occurred in Duval County, Texas," and [that] she is a resident of Texas. These allegations, when considered together and liberally construed, assert that Ji-Haw committed a tort in Texas, which is all that is required under the long-arm statute. *See Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004) (holding that in determining plea to jurisdiction[,] pleadings are liberally construed in favor of pleader in assessing whether he has [pleaded] sufficient facts to demonstrate trial court's jurisdiction); *id.* at 240 (Brister, J., dissenting) (categorizing substance of special appearance as plea to jurisdiction); *see also* Tex. Civ. Prac. & Rem. Code Ann. § 17.042(2). *By describing the incident, alleging it was a result of the XBOX, including component parts manufactured by the "Defendants," alleging the incident forming the basis of the suit occurred in Texas, and [alleging] that she is a Texas resident, Broquet did, contrary to Ji-Haw's assertion, allege sufficient facts to bring Ji-Haw within the long-arm statute.*

*Id.* at *2 (emphasis added).

As noted, Southwire argues that the amended petition's jurisdictional allegations are inadequate under the Texas Supreme Court's holding in *Kelly*, 301 S.W.3d at 657. One court attempted to use *Kelly* to argue that *Ji-Haw*'s holding on when a petition contains sufficient jurisdictional allegations is no longer persuasive. *See Carey v. State*, No. 04-09-00809-CV, 2010 WL 2838631, at *5 (Tex. App.—San

24

Antonio July 21, 2010, pet. denied) (mem. op.). That effort failed because unlike the allegations in *Ji-Haw*, *Kelly* involved a pleading stating that no acts had occurred in Texas. *Id.* Here, like in *Ji-Haw*, the Sparkses' amended petition alleges numerous acts that allegedly occurred in Texas.

To support its contention that the Sparkses' petition was so bereft of jurisdictional allegations that a denial of at-home status was sufficient to carry its burden to negate jurisdiction, Southwire also relies on *Vinmar Overseas Singapore PTE Ltd. v. PTT International Trading PTE Ltd.*, 538 S.W.3d 126, 133 (Tex. App.—Houston [14th Dist.] 2017, pet. denied). The plaintiff in *Vinmar* alleged tortious acts in the form of misappropriation of trade secrets and tortious interference but did not allege that those acts were committed in Texas. *Id.* *Vinmar* rejected an argument that jurisdiction could be predicated on where the "effect" of the tort might be felt. *Id.* at 135. *Vinmar* is inapposite to the issues in this appeal because it provides no guidance on the question of whether a petition alleges sufficient facts to establish purposeful availment.[2]

---

[2]The parties dedicate lengthy portions of their briefs to arguing whether Southwire has waived the arguments that it makes to this court because Southwire did not make the arguments to the trial court. Though we do not agree with Southwire's arguments, we do not view Southwire as having waived the arguments because Southwire has more fully developed them on appeal. *See Comm'n for Lawyer Discipline v. Cantu*, 587 S.W.3d 779, 784 (Tex. 2019) ("We do not consider *issues* that were not raised in the courts below, but parties are free to construct new *arguments* in support of issues properly before the Court." (quoting *Greene v. Farmers Ins. Exch.*, 446 S.W.3d 761, 764 n.4 (Tex. 2014))).

We also reject Southwire's arguments that focus not on what the Sparkses alleged but on what they did not allege. Southwire places great emphasis on the fact that the Sparkses did not plead or provide evidence that the incident allegedly caused by defects in the surge protector and the RV's wiring occurred in Texas. We are unpersuaded that the core fact in the jurisdictional analysis in this case is that the RV's electrical system malfunctioned while the RV was in Texas. The allegations are that Southwire purposely availed itself of doing business in Texas and manufactured a product sold to a Texas resident in Texas by one of its dealers and that said product caused an injury to a Texas resident.[3] The device was incorporated into another product that was mobile and that was intended to be used by its owner as tantamount to a residence while traveling. As the Sparkses allege,

> 51. The Dealer sold the Dwelling to the Sparks[es], who purchased the Dwelling.

---

[3]Southwire argues that there is no allegation that the Sparkses are Texas residents because their petition describes them as citizens of Texas. Southwire argues that "citizenship for federal diversity jurisdiction purposes is not the same as residency for purposes of state court personal jurisdiction." Southwire cites a Dallas Court of Appeals opinion holding that citizenship for diversity purposes and residency for jurisdictional purposes are different concepts, and an admission that a party is a state citizen for purposes of diversity citizenship is not an admission that a party is a state resident. *See Favour Leasing, LLC v. Mulligan*, No. 05-13-01000-CV, 2014 WL 4090130, at *8 (Tex. App.—Dallas Aug. 19, 2014, no pet.) (mem. op. on reh'g). The Sparkses' petition describes them as being "citizen[s] of Texas" and also lists their address as being in Texas. Certainly, the language of the Sparkses' petition is imprecise, but fairly viewed, we consider the allegations as an attempt to allege residency rather than citizenship. Nothing in the petition suggests that the Sparkses were referring to the principles of federal-diversity jurisdiction when using the loose term "citizen."

26

52. The Sparks[es] purchased the Dwelling with the clear and express purpose of using the Dwelling for residential living. That was how the product was used.

53. The Dealer had knowledge that its travel trailers were being purchased for the particular purpose of using the travel trailers as mobile residences.

To hold that a Texas court did not have jurisdiction when the Sparkses used the RV for its intended purpose and traveled in it, possibly outside the state, would mean that Texas residents who purchase a product in Texas designed to be used as a mobile residence would be left without the protections of the Texas courts should they be injured while using that product for its intended purpose. Holding that such a fortuitous fact frees a defendant from the reach of Texas courts disregards the true bases for jurisdiction—that when a Texas resident is injured by a product that he was sold by a defendant that directed its efforts at a Texas market, the Texas resident should have recourse in Texas courts.

Further, Southwire attacks the Sparkses' warranty allegations under the guise that it is attacking their jurisdictional allegations. Southwire's challenges include that the Sparkses never pleaded how the warranty arose, whether the warranty was express or implied, or how the warranty was dishonored, nor did they offer a warranty into evidence. Though not germane to the resolution of these arguments in the context of a special appearance, we note that the Sparkses pleaded that their claim against Southwire was based on the implied warranty of merchantability. That said, Southwire's arguments are a merits-based attack on the Sparkses' cause of action.

27

That attack should be considered later. *See Wilmington Tr., Nat'l Ass'n v. Hsin-Chi-Su*, 573 S.W.3d 845, 859 (Tex. App.—Houston [14th Dist.] 2018, no pet.) ("[W]e do not consider the merits of a party's claims when analyzing personal jurisdiction."). At this point, our concern is only whether the allegations meet the tests for specific jurisdiction.

We conclude that the Sparkses pleaded a basis for specific jurisdiction. Southwire's denial that it was a Texas resident was not sufficient in and of itself to satisfy its burden to negate that a Texas court has personal jurisdiction over it.

Further, because of the posture of this case, we go beyond the pleadings' allegations and also review other materials submitted by the parties as evidence that we can consider in our jurisdictional analysis. In the disjointed approach used in this case, Southwire filed its declaration before the Sparkses amended their petition. Then, the Sparkses amended their petition, basing their jurisdictional allegations on certain facts that Southwire had included in its declaration, and filed their own evidence in the form of the screenshot from Southwire's website that listed United RV Sales—the dealer from which the Sparkses allegedly purchased the RV—as Southwire's dealer.[4] Southwire combines its arguments as challenges to both the

---

[4]The defendants' names contained in the Sparkses' petition and the name listed on the website do not match. But the Sparkses alleged that the company listed on Southwire's website was where they had purchased the Surge Guard. Southwire does not argue that the company listed on its website and the company where the Sparkses purchased the Surge Guard are different entities.

Sparkses' allegations in their pleadings and the proof before the trial court. The Sparkses do the same.

Here, neither party suggests that we cannot consider the evidence and attachments to Southwire's special appearance and the Sparkses' response. Further, Rule 120a provides that we should consider that material. *See* Tex. R. Civ. P. 120a(3) ("The court shall determine the special appearance on the basis of the pleadings, any stipulations made by and between the parties, such affidavits and attachments as may be filed by the parties, the results of discovery processes, and any oral testimony."); *see also Steward Health Care Sys. LLC v. Saidara*, No. 05-19-00274-CV, 2021 WL 3707995, at *17 (Tex. App.—Dallas Aug. 20, 2021, no pet.) (Schenck, J., concurring) (stating that Rule 120a and supreme court precedent provide that the trial court "clearly contemplates consideration of . . . things other than just the pleadings, namely, evidence"). Thus, the mix of information that we use to analyze the trial court's denial of the special appearance includes the pleadings and the attachments to Southwire's special appearance and the Sparkses' response.

**B.** **We will analyze the findings we imply to support the trial court's denial of Southwire's special appearance to determine whether there is any evidence to support the findings.**

We have no guidance from the trial court regarding how it analyzed the mix of allegations and evidence because it filed no findings; thus, we imply the findings necessary to support the trial court's denial of the special appearance. *See Luciano*, 625 S.W.3d at 8. These implied findings are tested by evidentiary sufficiency standards.

29

*See BMC Software*, 83 S.W.3d at 795. Southwire's issue asserts that there is not legally sufficient evidence to support the trial court's order. Thus, we will review that issue under legal-sufficiency standards, i.e., whether there is more than a scintilla of evidence to support the denial of the special appearance. *See id.*[5]

[5]At least one court reviewing findings made in a special appearance suggests that when no live testimony is taken at a special-appearance hearing, a trial court's findings should receive no "special deference" and should apparently be reviewed de novo rather than under traditional sufficiency standards. *See Villagomez v. Rockwood Specialties, Inc.*, 210 S.W.3d 720, 726–27 (Tex. App.—Corpus Christi–Edinburg 2006, pet. denied). Though the cited opinion raised these concerns, it ultimately held that "[n]otwithstanding these concerns, we conduct the due-process personal-jurisdiction review by crediting evidence that supports the trial court's findings of fact if reasonable jurors could[] and by disregarding contrary evidence unless reasonable jurors could not." *Id.* at 727 (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005)). Our court has addressed the nature of the review given both filed and implied findings made when a trial court did not hear live testimony as part of its determination of a special appearance; we decided to adhere to traditional sufficiency standards to review these findings. *See OZO Capital, Inc. v. Syphers*, No. 02-17-00131-CV, 2018 WL 1531444, at *5 (Tex. App.—Fort Worth Mar. 29, 2018, no pet.) (mem. op.) (concluding that it was unnecessary to address question regarding whether implied findings entered after a non-evidentiary hearing on a special appearance that turned on credibility determinations should be reviewed de novo); *Norstrud v. Cicur*, No. 02-14-00364-CV, 2015 WL 4878716, at *4, *8–9 (Tex. App.—Fort Worth Aug. 13, 2015, no pet.) (mem. op.) (declining to follow the holding of our sister court in *Villagomez* that lesser deference is required by this court to findings of fact adopted verbatim "[b]ecause the Texas Supreme Court has not adopted differing standards of review for findings of fact adopted verbatim from a prevailing party's proposed findings of fact versus findings of fact not adopted verbatim or modified by the trial court"); *Moncrief Oil Int'l, Inc. v. OAO Gazprom*, 332 S.W.3d 1, 7–8 (Tex. App.—Fort Worth 2010) (noting that when no evidentiary hearing was held on special appearance, appellate court is in "the same position as the trial court and implying all facts supported by the evidence in favor of the trial court's ruling seems inappropriate," but nevertheless deferring "to all implied findings of fact that support the trial court's grant of Appellees' special appearances so long as legally and factually sufficient evidence—i.e., factual statements set forth in the affidavits, exhibits, and deposition

**C.** **There is some evidence to support the trial court's implied findings that underlie a conclusion that Southwire purposefully availed itself of the privilege of doing business in Texas.**

First, we must address the question of what standard to use as a template to assess the evidence. Southwire argues that because the Sparkses alleged a breach-of-warranty claim, as opposed to a products-liability claim, a stream-of-commerce-plus test is somehow inapt. Southwire does not tell us what the alternative test should be. No matter, we agree with the Dallas Court of Appeals that, for the time being, the Texas Supreme Court does not distinguish between contract- and tort-based claims in its jurisdictional analysis. *See LG Elecs., Inc.*, 2020 WL 4281965, at *14. Nor shall we.

Thus, with respect to specific jurisdiction, the first implied findings made by the trial court must be those associated with whether Southwire purposefully availed itself of the Texas market by doing business in Texas under the stream-of-commerce-plus test. Specifically, we examine whether Southwire placed its product in the stream of commerce and engaged in "additional conduct [that] may include advertising in the forum state[;] soliciting business through salespersons[;] or creating, controlling, or employing the distribution system that brought the product into the forum state." *See Luciano*, 625 S.W.3d at 10 (citations omitted).

---

excerpts filed with the trial court—exists supporting them"), *aff'd in part & rev'd in part*, 414 S.W.3d 142 (Tex. 2013). We will also adhere to traditional sufficiency review.

Here, the Surge Guard, which Southwire admitted that it had manufactured, ended up in Texas. Though Southwire asserted that it had manufactured the Surge Guard in Honduras, it acknowledged that it had manufactured it all the same.

Southwire itself offered evidence that it has two manufacturing facilities and a distribution facility in Texas. We do not know what specific products are distributed by this facility, but there is nothing in the record to indicate that the distribution facility was completely divorced from distribution of the type of surge protector that is at issue or that the purpose of the distribution facility was for a purpose unrelated to distributing products to the Texas market. *See Spir Star*, 310 S.W.3d at 875. As noted, the supreme court in *Luciano* placed great emphasis on the fact that the defendant challenging jurisdiction distributed its product in Texas, even though its distribution facility was run by a third party. 625 S.W.3d at 10–11. Thus, the existence of the distribution center is some evidence that Southwire purposefully availed itself of the Texas market.

*Luciano* also emphasized that the manufacturer challenging jurisdiction used a Texas agent to market its product. *Id.* at 11–12. As a general principle, *Luciano* noted that "direct[ing] marketing efforts to [the forum state] in the hope of soliciting sales" may render a nonresident subject to the state's jurisdiction in disputes "arising from that business[.]" *Id.* at 10. Here, Southwire tried to distance itself from any effort to use a Texas agent to sell its products and offered evidence that

> [g]enerally, Southwire's Surge Guards are not sold to the public but are sold to unrelated distributors. Those unrelated distributors generally resell the products to dealers, who resell to the public. The dealers are also unrelated to Southwire. In other words, usually, Southwire is at least twice removed from a retail customer.

As noted by the Sparkses, the quote is hedged by the use of the word "generally" in two places—an indication that the evidence does not cover the entire universe of Southwire's marketing efforts.

Also, as *Luciano* noted, it is not the nature of the manufacturer–dealer relationship but the intent to target a state's market that is the focus of the purposeful-availment analysis. *Id.* at 12. There is evidence that Southwire targeted the Texas market. The Sparkses countered Southwire's attempt to distance itself from the sales process by producing the screenshot from a page of Southwire's website that has the title "Where to Buy?" and directed the viewer to "Find a Dealer Near You." With search criteria entered for Fort Worth, the website produced a listing for the dealer from whom the Sparkses purchased the RV and the Southwire surge protector. Though the page that the Sparkses attached to their response is unclear, it appears that Southwire has a number of other dealers in Texas. So the trial court considered evidence from which it could infer that the dealership "distancing" urged by Southwire was pretextual. First, distancing itself from the distributor does not insulate a seller so long as it is acting to target the Texas market. *Id.* at 11–12. Second, the Sparkses offered evidence that undermined Southwire's claim of a hands-off approach to the marketing of its product in Texas; its website identified the entity

33

that sold the surge protector to them as a dealer for Southwire's products and showed that it apparently had other dealers in Texas. Utilizing a Texas dealer is a factor establishing purposeful availment, and the Sparkses' evidence constitutes more than a scintilla of evidence that Southwire had such a dealer.[6]

To counter the Sparkses' evidence, Southwire shrugs off the website by citing a case from our court holding that national advertising is not specifically targeted at Texas residents. Southwire's argument is that

> [w]hen a defendant advertises nationally, Texas residents are not specifically targeted. *Michel v. Rocket Eng'g Corp.*, 45 S.W.3d 658, 680 (Tex. App.—Fort Worth 2001, no pet.). There is nothing on the web page to indicate that the website is not available to everyone on the planet with an Internet connection. Indeed, Appellees' evidence reflects that anyone can type in their location to find a dealer registered to do business near them.

This argument begs the question. The relevance of the website is not that it is an untargeted advertisement that anyone can access. It is that Southwire is identifying a dealer in Texas for its products. *See, e.g.*, *Sentry Select Ins. Co. v. Terex Corp.*, No. H-14-2396, 2015 WL 13121260, at *2 (S.D. Tex. Feb. 3, 2015) (order) ("Here, Terex Pegson has an official dealer not only within the United States[] but within Texas specifically. Terex Pegson's 'website directs customers to Powerscreen Texas, its "official" Texas dealer.'" (citation omitted)). As the Amarillo Court of Appeals has held, "[T]here needs to be more than the existence of a website (whether interactive or not) to

---

[6]Southwire takes issue with the Sparkses' use of the term "registered dealer" when describing United RV Sales. We interpret the term as the Sparkses' attempting to convey that United RV is listed "or registered" on Southwire's website.

support an inference that the forum was targeted by the website owner or that the latter directed its marketing efforts at the forum." *See Retire Happy, L.L.C. v. Tanner*, No. 07-16-00134-CV, 2017 WL 393984, at *5 (Tex. App.—Amarillo Jan. 27, 2017, no pet.) (mem. op.). Here, there is that something more: It is the dealer relationship that shows Southwire is directing its sales efforts to Texas.[7]

Southwire also tries to diminish the impact of the web page because the Sparkses do not allege that their purchase was related to Southwire's directions on its web page. Southwire argues,

> [The Sparkses'] own pleading establishes that [they] did not purchase a [S]urge [G]uard because of something on a web page. Instead, [the Sparkses] allege that they bought a [S]urge [G]uard because, "[t]he Dealer represented to [them] that if they did not purchase the [s]urge [p]rotector together with their purchase of the RV, it would void the warranty on their new RV." Thus, based on [the Sparkses'] admission, the sale was unrelated to [Southwire's] web presence or any contact between [it] and Texas. [Southwire's] web presence is too attenuated for specific jurisdiction to attach here. [Record reference omitted.]

The court of appeals in *Luciano* relied on a similar rationale by holding that there could be no purposeful availment because the plaintiffs did not choose an installer of the spray-foam insulation based on a preexisting relationship they knew that the insulation manufacturer had with its installer. 625 S.W.3d at 12–13. The supreme

---

[7]Southwire cites our opinion in *Anderson v. Safeway Tom Thumb*, No. 02-18-00113-CV, 2019 WL 2223582 (Tex. App.—Fort Worth May 23, 2019, pet. denied) (per curiam) (mem. op.), in support of its argument that listing a dealer did not establish that a claim was related to the purposeful contact. *Anderson* is distinguishable. The product at issue in *Anderson* was a chair that was sold to a grocery-store chain, not a product sold to a Texas consumer from a dealer identified on the manufacturer's website. *See id.* at *8.

court rejected this analysis because it "shifted the focus from the *defendant's* relationship with the forum state to the *plaintiff's intent*. But evidence of the plaintiff's mental state is immaterial to the defendant's purposeful availment." *Id.* at 12. Southwire's argument attempts to make the same unwarranted shift from its acts of purposeful availment to the Sparkses' intent.

Southwire next asserts, apparently as part of its challenge to the contention that it purposefully availed itself of doing business in Texas, that it "never sold a surge guard like the one described in the [Sparkses'] [p]etition to any dealer in Texas." Again, the declaration of Southwire's employee is not quite as categorical as its brief portrays it to be. The declaration states,

> While [the Sparkses have] not provided a serial number, lot number, or other information about the alleged Surge Guard at issue to enable Southwire to identify the specific device, Southwire cannot locate any record of selling a Surge Guard with the model referenced in the [p]etition to an RV dealer in Texas.[8]

Thus, the declaration hedges from making a categorical statement that it never sold a surge protector of the type in question to a Texas RV dealer, leaving unanswered questions such as whether the records it searched cover its facility for distribution or an intermediary. And the flip side of the record is that the Sparkses' presented

---

[8]The declaration also states that "Southwire's records reflect that it has not sold the Surge Guard with the model number referenced in the [p]etition since 2015." How Southwire contends that this fact should impact our analysis is unclear. The Sparkses claim that the injury-causing event occurred in late 2016. If Southwire is arguing that the period of time between production of the Surge Guard and the injury-causing event has some unexplained impact on the purposeful-availment analysis, it is not clear that the time gap it relies on even exists.

36

evidence that they purchased a surge protector from an entity identified as a Southwire dealer and that Southwire acknowledged that it manufactured that model of surge protector. Again, Southwire, in essence, argues that the trial court was bound to accept its view that it did not avail itself of doing business in Texas because it claims that it has never sold a surge protector of the type at issue to a Texas RV dealer, even though there is evidence prompting the opposite inference because the Sparkses purchased a Southwire Surge Guard in Texas from an entity that Southwire stated was a place where one could buy its products. Again, this is some evidence that Southwire purposely availed itself of the Texas market for its products.

We do not have a record as well developed as the one in *Luciano*. But the question is whether there is more than a scintilla of evidence to support the trial court's implied findings that underlie a conclusion that Southwire purposefully availed itself of the privilege of doing business in Texas. We conclude that the trial court's implied findings—that Southwire targeted the Texas market and thus purposefully availed itself of doing business in Texas—are supported by more than a scintilla of evidence.

**D.** **There is some evidence to support the trial court's implied findings that underlie a conclusion that an adequate relationship exists between Southwire's contacts with Texas and the Sparkses' claims.**

Having given an affirmative answer to the question of whether Southwire purposefully availed itself of the Texas market for its products, the next question is

whether the Sparkses' claims are sufficiently related to those contacts to permit the exercise of specific jurisdiction. We conclude that they are.

We are again guided by *Luciano*. And *Luciano* followed the lead of *Ford Motor Co.* in holding that there need not be a causal relationship between the claim and the contact; an adequate noncausal connection is sufficient. *Id.* at 14. *Luciano* applied the *Ford Motor Co.* analysis to a company that appears similar in size to Southwire. That is, *Luciano* applied the *Ford Motor Co.* analysis even though the insulation manufacturer challenging jurisdiction was not a multinational corporation like Ford and even though its marketing efforts in the state were not decades-long in duration like Ford's were in the forum states where it was sued. *Id.* at 16–17.

*Luciano* focused on the following: (1) the injury occurred in the Texas residents' home; (2) the homeowners alleged that the defendant sold its product in Texas and that the defendant did not claim that the sale was an isolated occurrence; and (3) even though the homeowners could not prove that the product was distributed by the defendant's Texas distributor, that did not matter because "[i]t [was] sufficient that [the manufacturer had] intended to serve a Texas market for the insulation that the [homeowners] allege[d] injured them in this lawsuit." *Id.* at 17.

As noted, the Sparkses are coy by not disclosing the state where the RV was located when the electrical incident occurred. But they claim to be Texas residents/citizens. They purchased the RV in Texas to be used for residential living. Southwire does not claim that Surge Guards are not sold for use in RVs as the

38

Sparkses allege. In essence, Texas residents are claiming that they purchased the product for use in their home, though that home was on wheels. Though not as strong perhaps as if the injury had occurred in Texas, there was a direct impact on Texas residents that resulted from the sale of a Southwire product in Texas.

Further, to paraphrase *Luciano*, "the [Sparkses] allege—and [Southwire] does not deny—that [Southwire] sold [Surge Guards] in Texas[, and Southwire] does not contend that the sale of [Surge Guards] . . . was an 'isolated occurrence' in Texas." *See id.* Certainly, Southwire bobs and weaves on this issue by claiming that it "generally" uses unrelated distributors and "cannot locate any record" of selling the specific model of Surge Guard that the Sparkses claim that United RV sold to them. But the fact remains that Southwire acknowledges that it manufactured the type of Surge Guard that the Sparkses identified in their petition, and the Sparkses claim that they purchased the Surge Guard from a company that Southwire identifies as a dealer on its website's listing of where to buy its products. That same website listing appears to show a number of Southwire dealers in Texas. Thus, the trial court was left to reconcile what appeared to be conflicting portrayals of how Southwire distributes its products in Texas. There is more than a scintilla of evidence that—contrary to Southwire's carefully phrased declaration—Southwire intended to serve the Texas market for the Surge Guard at issue, and this establishes a relationship between Southwire's Texas contacts and the Sparkses' claims.

Also, Southwire acknowledges that it has a distribution facility in Texas for its products. As noted, the *Luciano* plaintiffs' inability to establish that the barrel of foam insulation that they received came from the defendant's distribution center did not sever the necessary relationship between the claim and the contacts; the fact that the defendant intended to serve the Texas market for the allegedly injury-causing product was a sufficient relationship. *Id.* Though we have no evidence regarding what products are distributed from Southwire's Texas distribution facility, Southwire offers no proof that this distribution facility does not distribute the type of Surge Guard at issue. It offers no proof that the particular Surge Guard that the Sparkses purchased made its way to the Texas market in some way unrelated to the distribution facility or by some other isolated occurrence. Again, this is some evidence of a relationship between Southwire's contacts and the Sparkses' claims.

We conclude that there is more than a scintilla of evidence to support implied findings that, in turn, support a conclusion that there is a sufficient relationship between the Sparkses' claims and Southwire's contacts with Texas to establish the necessary relationship between the two for purposes of the exercise of specific jurisdiction over Southwire.[9]

---

[9]Southwire does not assert that the exercise of jurisdiction over it would violate traditional notions of fair play and substantial justice. *See Spir Star*, 310 S.W.3d at 878–79 (listing considerations of fair play and substantial justice as follows: (1) "the burden on the defendant"; (2) "the interests of the forum state in adjudicating the dispute"; (3) "the plaintiff's interest in obtaining convenient and effective relief"; (4) the interstate or international judicial system's interest in obtaining the most

## V. Conclusion

We have detailed our analysis regarding why we conclude that Southwire purposefully availed itself of the Texas market to sell its products and why the Sparkses' claims are sufficiently related to those contacts to support an exercise of specific jurisdiction over Southwire. We therefore overrule Southwire's sole issue, and we affirm the trial court's order denying Southwire's special appearance.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered: November 18, 2021

---

efficient resolution of controversies; and (5) the shared interest of the several nations or states in furthering fundamental substantive social policies). Thus, we do not address that issue. Further, our resolution of this appeal on the basis of specific jurisdiction obviates the need to discuss the issue of general jurisdiction.